**FOREST CONSERVATION COUNCIL; Ouachita Watch League; Jerry Williams; and Sierra Club Plaintiffs**

v.

**Robert JACOBS, in his official capacity as Regional Forester of the Southern Region of the U.S. Forest Service; Dale Bosworth, in his official capacity as Chief of the U.S. Forest Service; the United States Forest Service, an agency of the United States Department of Agriculture; Ann Veneman, in her official capacity as Secretary of the U.S. Department of Agriculture; and the United States Department of Agriculture Defendants**

No. CIV.A.1:03–CV1230ODE.

United States District Court, N.D. Georgia, Atlanta Division.

June 16, 2005.

Donald D.J. Stack, Stack & Associates, Atlanta, GA, Eric Eugene Huber, Sierra Club, Boulder, CO, Jonathan Lee Schwartz, Jon L. Schwartz, Attorney at Law, P.C., Atlanta, GA, for Quachita Watch League, Jerry Williams, Forest Conservation Council, Sierra Club, Plaintiffs.

Brian C. Toth, U.S. Department of Justice, Environment & Natural Resources Division, Pamela S. West, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, Robert David Powell, Office of United States Attorney, Northern District of Georgia, Atlanta, GA, for Robert Jacobs in his official capacity as Regional Forester of the Southern Region of the U.S. Forest Service, Dale Bosworth in his official capacity as Chief of the U.S. Forest Service, United States Forest Service an agency of the United States Department of Agriculture, Ann Veneman in her official capacity as Secretary of the U.S. Department of Agriculture, and, United States Department of Agriculture, Defendants.

## ORDER

ORINDA D. EVANS, District Judge.

In this civil action, environmental organizations ["Plaintiffs"] seek declaratory and injunctive relief against the U.S. Department of Agriculture ("USDA"), the U.S. Forest Service and officers of the Forest Service and USDA ["Defendants"]. Plaintiffs' primary claim is that the actions of Defendants in approving five projects in the Ouachita National Forest in Arkansas [1] were arbitrary and capricious. This claim is based on the contention that Defendants lacked "adequate population inventory information" for federally protected species ("PETS") and "quantitative data" for management indicator species ("MIS"). Plaintiffs allege this violated (1) the National Forest Management Act ("NFMA"), 16

---

1. The instant case, filed in May 2003, began as a challenge to thirty-two (32) timber sales in eight different National Forests in the United States Forest Service's Southern Region, which is headquartered in Atlanta. In October 2003, Defendants moved to sever Plaintiffs' claims and transfer them to U.S. District Courts in the districts where the proposed projects were located.

After a hearing in December 2003, the Court issued an order [# 61] granting in part Defendants' Motion to Sever Plaintiffs' Claims and to Transfer Venue. By that order, the Court severed Plaintiffs' claims into four cases and determined that the Mississippi claims should be transferred to the Southern District of Mississippi, the Texas claims to the Southern District of Texas, and the Virginia claims to the Western District of Virginia. The Court retained the claims related to the Ouachita National Forest in Arkansas and Oklahoma because of their connection to another case pending in this court, *Chattooga Conservancy et al. v. Robert Jacobs, et al.*, Civil Action No. 1:01–cv–1976–ODE (N.D.Ga.). That case also involves projects in the Ouachita National Forest.

On January 20, 2004 and pursuant to an order severing all claims outside the Ouachita National Forest, Plaintiffs filed their Second Amended Complaint [# 98] challenging only five projects within the Ouachita National Forest. That complaint is the relevant complaint for the current cross motions for summary judgment.

U.S.C. §§ 1600–1687; (2) the provisions of the Ouachita Forest Plan; and (3) regulations promulgated under NFMA. Plaintiffs also claim that Defendants violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4347, by approving five projects pursuant to deficient environmental assessments and without preparing full environmental impact statements.

"Neither NFMA nor NEPA provides a cause of action." *Tulare County v. Bush,* 306 F.3d 1138, 1143 (D.C.Cir.2002); *see also Lujan v. National Wildlife Federation,* 497 U.S. 871, 872, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). The Court's jurisdiction is derived from the Administrative Procedure Act ("APA"), 5 U.S.C. § 701–706.

In December 2003 the Court granted in part Plaintiffs' Motion for a TRO [# 60]. That order restrained Defendants from permitting logging or road construction activities at the following five sites in the Ouachita National Forest:

(1) Gafford Creek Watershed project;

(2) Kinsey Ecosystem project;

(3) Middle North Fork of the Ouachita River project;

(4) Kingdoodle Ecosystem Management project; and

(5) Logan Side Ecosystem Management project.

An evidentiary hearing was held in January, 2004 on Plaintiffs' Motion to convert the TRO into a Preliminary Injunction. In August, 2004 the Court denied that motion [# 140]. However, in light of the complexity of the case, the delays in compiling a reviewable administrative record and the pending summary judgment motions, the Court ordered that the TRO remain in effect.

This case is now before the Court on the parties' cross motions for summary judgment. Plaintiffs' motion is DENIED and Defendants' motion is GRANTED. The Temporary Restraining Order is VACATED.

## I. FACTUAL AND LEGAL BACKGROUND

### A. *The National Forest Management Act*

The Ouachita National Forest, located in Arkansas and Oklahoma, contains over two million acres of land. The Forest Service manages the Forest primarily under the National Forest Management Act ("NFMA"), §§ 1600–1687, which requires the development of a land and resource management plan ("Forest Plan") for each forest. 16 U.S.C. § 1604. The Forest Plan must provide for multiple uses of the forest, including "outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." 16 U.S.C. § 1604(e)(1).

In order to ensure compliance with NFMA and the Forest Plan, the Forest Service also must conduct an analysis of each "site specific" action such as a timber sale. 16 U.S.C. § 1604(I). The Supreme Court in *Ohio Forestry Ass'n v. Sierra Club,* 523 U.S. 726, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998), described the process as follows. The Forest Service must (1) propose a specific project area and describe the methods to be used; (2) ensure that the project is consistent with the Forest Plan; (3) provide those affected with notice of the proposed project and an opportunity to be heard; (4) conduct an environmental analysis; and (5) make a final decision which affected persons may challenge in an administrative appeals process (first with an appeal reviewing officer, then with an appeal deciding officer—here, the Regional Forester) and in court (APA review of final agency action, as here). *See Id.* at 729–30, 118 S.Ct. 1665.

NFMA mandates that "wildlife habitat shall be managed to maintain viable popu-

lations of existing native and desired non-native vertebrate species in the planning area." 16 U.S.C. § 1604(g)(3)(B); 36 C.F.R. § 219.19.[2] "Planning area" means "the area of the National Forest System covered by a regional guide or Forest Plan" as opposed to a specific project area. 36 C.F.R. 219.3. In conducting forest planning the Forest Service is required to "estimate the effects of each [management] alternative on fish and wildlife" species that are selected "because their population changes are believed to indicate the effects of management activities." 36 C.F.R. § 219.19(a)(1). These species are known as "Management Indicator Species" ("MIS") because they act as indicators for the relative success of forest management.[3]

Of central importance to this case are two MIS-related regulations promulgated under NFMA. 36 C.F.R. § 219.19(a)(6) requires that "[p]opulation trends of the management indicator species will be monitored and relationships to habitat changes determined." 36 C.F.R. § 219.26 requires

the Forest Service to utilize "quantitative" data in its analysis of species diversity:

> Forest Planning shall provide for the diversity of plant and animal communities and tree species consistent with the overall multiple use objectives of the planning area. Such diversity shall be considered throughout the planning process. Inventories shall include quantitative data making possible the evaluation of diversity in terms of its prior and present condition.

"Diversity" is "[t]he distribution and abundance of different plant and animal communities and species within the area covered by a [Forest Plan]." 36 C.F.R. § 219.3.

In *Sierra Club v. Martin,* 168 F.3d 1, 4–7 (11th Cir.1999), the United States Court of Appeals for the Eleventh Circuit held that logging projects in the Chattahoochee National Forest could not proceed because the Forest Service did not have quantitative MIS data in compliance with these

**2.** Recently substantial revisions were made to the NFMA regulations found at 36 C.F.R. § 219. *See* 70 F.R. 1023–1061 (Jan. 5, 2005). The regulations pertaining to Management Indicator Species ("MIS") were repealed. When citing 36 C.F.R. § 219, unless otherwise stated, the Court refers to the 1982 regulations that were in force until January, 2005, and therefore at the time the subject projects were approved.

**3.** The MIS selected must include the following categories where appropriate: "endangered and threatened plant and animal species identified on State and Federal lists for the planning area; species with special habitat needs that many be influenced significantly by planned management programs; species commonly hunted, fished or trapped; non-game species of special interest; and additional plant or animal species selected because their population changes are believed to indicate the effects of management activities on other species of selected major biological communities or on water quality." 36 C.F.R. § 219.19(a)(1).

In 2001 there were 77 MIS for the Ouachita National Forest and they included 21 stream fishes, 7 lake/pond fishes, 15 terrestial vertebrates (including birds), and 34 plants. *See* "A Summary and Analysis of Data Pertaining to Management Indicator Species for the Ouachita National Forest" (May 1, 2001), Introduction. [ONF Forest Plan Admin. Rec. VII]. This 2001 Ouachita National Forest MIS Summary is also available at *www. fs.fed.us/oonf/ mis/mis toc.htm.*

In December 2001 the MIS for the Forest were reduced to 27 in number, including 17 fish, 7 vertebrates (including 6 birds) and 3 plants. [ONF Forest Plan Amendment 33, ONF Forest Plan Admin. Rec. I, tab 17]. Some of the fish are "reverse indicators". Their proliferation would be a bad sign.

While MIS species may be rare species, most are not. For example, white-tailed deer and flowering dogwood are MIS species for the Ouachita National Forest. The only federally protected species which are MIS for the Ouachita National Forest are the Red Cockaded Woodpecker, an endangered species, and the Yellow Lady's Slipper, a sensitive species.

regulations. The significance of *Martin's* holding is central to this case and is discussed in detail below.

### B. *National Environmental Protection Act*

Unlike NFMA, the National Environmental Protection Act ("NEPA"), 42 U.S.C. §§ 4321–4347, "imposes procedural but not substantive requirements" on federal agencies. *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 546 (11th Cir.1996). "NEPA does not work by mandating that agencies achieve particular substantive environmental results," *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989), but rather by requiring that agencies study and consider the environmental consequences of proposed actions before the actions are taken. *Fund for Animals*, 85 F.3d at 546.

The heart of NEPA is its requirement that federal agencies prepare an environmental impact statement ("EIS") as part of any "proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(©); *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 124 S.Ct. 2373, 2384, 159 L.Ed.2d 137 (2004). In order to determine whether a proposed action is a "major" one which "significantly" affects the human environment, agencies may produce a shorter document, known as an environmental assessment ("EA"). 40 C.F.R. § 1501.4; *Fund for Animals*, 85 F.3d at 546. "The purpose of an EA is to '[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental

impact statement or a finding of no significant impact.' " *Hill v. Boy*, 144 F.3d 1446, 1450 (11th Cir.1998) (*quoting* 40 C.F.R. § 1508.9(a)(1)). A "finding of no significant impact" ("FONSI") means that an environmental impact statement is not required. 40 C.F.R. § 1501.4; *Dep't of Transportation v. Public Citizen*, 541 U.S. 752, 124 S.Ct. 2204, 2209–10, 159 L.Ed.2d 60 (2004).

Forest Plans adopted under NFMA must comply with NEPA. 16 U.S.C. § 1604(g)(1). NEPA also applies to amendments to a Forest Plan, and to projects within a forest. 16 U.S.C. § 1604(I).

### C. *The Ozark/Ouachita Vegetation Management Plan and the Ouachita National Forest Plan*

In 1990, Defendants issued a document entitled "Final Environmental Impact Statement for Vegetation Management in the Ozark/Ouachita Mountains." The document covers the Ouachita National Forest and also two other nearby national forests. The VMEIS is not a Forest Plan and is not solely an environmental impact statement. Rather, the VMEIS is a voluminous regional planning document combined with an environmental impact statement. It discusses comprehensively the implications of a range of vegetation management methods that may be used under different circumstances to maintain the health of the three national forests located in the Ozark/Ouachita region.[4]

The VMEIS instructs the Forest Service regarding which of five methods of vegetation management ( *i.e.*, prescribed fire,

---

4. According to the VMEIS, "vegetation management is the skillful care of plants by means other than timber harvest. It is done to help young trees survive and grow, to provide a variety of wildlife habitats, to reduce hazardous fuels, to improve range forage, and to maintain safe and efficient travelways and

utility lines." [1990 Ozark/Ouachita VMEIS at p. iii]. A more detailed discussion of the VMEIS can be found in the companion case *Chattooga Conservancy et al. v. Robert Jacobs, et al.*, Civil Action No. 1:01–cv–1976–ODE (N.D. Ga.).

mechanical methods, manual methods, biological methods and herbicides) to use in which circumstances; the advisable intensity and frequency of the measures; and which management requirements and mitigation measures to apply to avoid harm to habitat and the health of the forest. "Management requirements" in the VMEIS set forth directions on how resources within the forests will be managed—in particular the criteria for determining which of the five methods is most applicable in a given situation.

"Mitigation measures" are actions taken to lessen adverse impacts or enhance beneficial effects of a given management method. For example, one herbicide-specific mitigation measure states that "Herbicides are applied at the *lowest* rate effective in meeting project objectives and according to guidelines for protecting human and wildlife health." This mitigation measure then sets out a table of maximum application rates for a range of herbicides. [1990 Ozark/Ouachita VMEIS, at II–55].

In addition to mitigation measures that are specific to each of the five management methods, the VMEIS also discusses "General Management Requirements and Mitigation Methods" that apply to all five management methods. One of these general mitigation measures, entitled "Site-specific Analysis," is central to Plaintiffs' claims:

**1. General Management Requirements and Mitigation Measures**

a. Site–Specific Analysis

The following general requirements and measures apply to vegetation management methods. Each forest may be more restrictive, but not less.

(1) Projects must have site-specific analysis in compliance with the National Environmental Policy Act (NEPA).

\* \* \* \* \* \*

(2) A biological evaluation of how a project may affect any species Federally listed as threatened, endangered, or proposed, or identified by the Forest Service as sensitive, is done by a biologist as part of the site-specific environmental analysis. This evaluation considers all available inventories of threatened, endangered, proposed, and sensitive species populations and their habitat for the proposed treatment area. When adequate population inventory information is unavailable, it must be collected when the site has high potential for occupancy by a threatened, endangered, proposed, or sensitive species. Appendix D identifies potential adverse effects from vegetation management by species. When adverse effects are projected, mitigation measures specified in appendix D and this chapter are used to prevent them. [1990 Ozark/Ouachita VMEIS, at II–40].

According to the VMEIS, the purpose of the site-specific analysis and the collection of PETS[5] data is "to ensure that these

---

**5.** "PETS" is an acronym for federally protected species, *i.e.*, proposed, endangered, threatened and sensitive species. A proposed species is one "that is proposed in the Federal Register to be listed under ... the [Endangered Species] Act." 50 C.F.R. § 402.02. An "endangered" species is "Any species that is in danger of extinction throughout all or a significant part of its range.... 16 U.S.C. § 1532(6)." Endangered species are designated in the Federal Register.

A "threatened species" is "Any species that is likely to become an endangered species within the foreseeable future throughout all of a significant part of its range." 16 U.S.C. § 1532(20). Said species are designated in the Federal Register.

A "sensitive species" is any "plant [or] animal species identified by a Regional Forester for which population viability is a concern, as evidenced by: significant current or predicted downward trends in population numbers or density; or significant or predicted downward trends in habitat capability that would reduce a species' distribution." *Forest Service Manual*, at § 2670.5(19).

species are protected when vegetation management projects (including those designed to benefit the species) take place." [Ozark/Ouachita VMEIS at IV–82]. The VMEIS also states that with respect to the Site–Specific Analysis requirements, "each forest may be more restrictive, but not less."

At the same time the VMEIS was published in 1990, the Forest Service also issued an amended Ouachita National Forest Plan. [ONF Forest Plan Admin. Rec. I, tab 1]. With respect to PETS species, the 1990 Ouachita National Forest Plan required that the Forest Service (1) Perform a biological evaluation on each project to determine possible effects on PETS species; (2) Assess the adequacy of existing inventories to allow biological evaluations; and (3) Undertake inventory work needed to fill data gaps on the distribution of PETS species. [Forest Plan, at IV–13].

Amendment 3 to the Forest Plan (March 1990) explicitly incorporated the precise language of the 1990 VMEIS regarding collection of "adequate population inventory information." Thus this part of the 1990 VMEIS became a part of the Forest Plan as well. [ONF Forest Plan Admin. Rec. I, tab 3].

The 1990 Ouachita Forest Plan identified the 77 PETS species possibly living in the Forest and described where they had been found or not found previously. These PETS species included proposed, threatened and endangered species which had been identified in the Federal Register (by the Fish and Wildlife Service) and also included sensitive species identified by the Regional Forester. The great bulk of

the PETS species for the Ouachita National Forest were sensitive species.

The 1990 Ouachita National Forest Plan also selected 70 MIS species. [Forest Plan, at p. IV–46].[6] The Forest Plan designated population objectives (both minimum and optimum) for certain of the species. For the Pileated Woodpecker, the Forest Plan assigned as both the minimum and optimum objective "1 pr. per sq. mi." [Forest Plan, at p. IV–47].

Chapter V of the 1990 Forest Plan, entitled "Implementation of the Forest Plan," includes a section captioned "Monitoring and Evaluation Program." [Forest Plan, at V–1]. That section states that "[t]he purpose of monitoring and evaluating implementation of the Forest Plan is to provide the Forest Supervisor with information on progress toward achieving the goals, objectives and standards. Monitoring does not do the inventory tasks. However, administrative reporting, where appropriate, may be considered a normal part of monitoring." [Forest Plan, at V–1]. Monitoring and evaluation is defined in the Plan's glossary as "the evaluation on a sample basis of Forest Plan management practices to determine how well objectives have been met, as well as the effects of those management practices on the land and environment." [Forest Plan, at GL–6].

The "Implementation" chapter of the 1990 Forest Plan also included a 30–page chart labeled "Monitoring and Evaluation Requirements," most of which concerned the monitoring and evaluation of MIS in the Ouachita National Forest. [Forest

---

**6.** In May, 2001 the Forest Service issued a document entitled "A Summary and Analysis of Data pertaining to Management Indicator Species for Stream Fishes, Lake and Pond Fishes, Terrestrial Vertebrates and Plants for the Ouachita National Forest ("MIS Summary")." [ONF Forest Plan Admin. Rec.

VII]. That document noted that the Forest Service had selected 77 MIS. The record does not make clear when the Forest Service increased the number of MIS in the Ouachita National Forest from 70 (in 1990) to 77 (in 2001). In December 2001, the number of MIS was reduced to 27.

Plan, V–3 through V–33]. Annual measurements were indicated for the Pileated Woodpecker. [Forest Plan, at V–14]. In 1994, Amendment 16 to the Forest Plan updated and revised the "Monitoring and Evaluation Program" section of the Forest Plan. [Amendment 16, ONF Forest Plan Admin. Rec. I, tab 7]. The new text no longer specifically mentioned the Pileated Woodpecker. In place of the chart, the new text lists various types of expected monitoring activities for MIS, including use of the annual Breeding Bird Survey and Census to "discover population trends and ecological indicators" [Amendment 16, ONF Forest Plan Admin. Rec. I, tab 7, at 20].

### D. Impact of Sierra Club v. Martin

In *Sierra Club v. Martin,* 168 F.3d 1 (11th Cir.1999), an environmental citizens' group challenged seven timber sales in the Chattahoochee and Oconee National Forests. Sierra Club asserted that the Forest Service had failed to collect "adequate population inventory information" for PETS within the project sites and that it had failed to collect "quantitative data" so as to allow proper monitoring of MIS both within the forest generally and within the project sites. Plaintiffs argued that these deficiencies required that the Forest Service's decisions approving the projects be set aside. The United States Court of Appeals for the Eleventh. Circuit largely agreed.

First, *Martin* held that the Forest Service violated the Chattahoochee–Oconee Forest Plan by implementing logging and road construction projects in the absence of "adequate population inventory information" on PETS where the proposed project sites had a high potential for occupancy by PETS. *Id.* at 5. The Court pointed out that the Forest Service "had no population inventory information and little in the way of population data for thirty-two of the thirty-seven vertebrate—PETS species that in-

habit the Forest", *id.* at 4, and that the Forest Service "admits in numerous places in the record that sensitive species do occur within the project sites and acknowledges that those individuals would be destroyed by the proposed timber sales." *Id.* at 4.

Second, *Martin* held that the Forest Service had violated the NFMA regulations concerning MIS found at 36 C.F.R. §§ 219.19 and 219.26. *Martin,* 168 F.3d at 7. The Court noted that "Section 219.26 requires the Forest Service to use quantitative inventory data to assess the Forest Plan's effects on diversity." *Id.* The Court of Appeals held that approving the challenged timber sales was arbitrary and capricious because "the Forest Service has no population data for half of the MIS in the Forest and thus cannot reliably gauge the impact of the timber projects on these species." *Id.* However, the Court rejected Plaintiff's claim that the Forest Service had an obligation to collect segregated data for MIS within a specific project area. *Id.* at 6.

The Chattahoochee–Oconee National Forest Plan contained identically worded PETS data collection language as that found in the 1990 Ozark/Ouachita VMEIS and the Ouachita National Forest Plan.

Following *Martin,* the Forest Service decided to amend the PETS language in the Ouachita Forest Plan and in other Southern Region Forest Plans. According to the Forest Service, these amendments were initiated out of concern that *Martin* might be read to require the Forest Service to collect extensive population data on every PETS species occurring in a proposed project area, regardless of whether the treatment method proposed for that site had any possibility of harming a given species or whether such data collection efforts might prove futile in light of the difficulty of finding often rare species.

The Forest Service stated that "the existing [PETS] provision does not clearly state the Forest Service's intent or support its view of the proper scientific methodology to be followed" regarding collection of PETS population information related to proposed projects. [Amendment 31 Decision Notice, ONF Forest Plan Admin. Rec. I, tab 15, at 3].

The relevant amendment to the Ouachita National Forest Plan was Amendment 31, which the Forest Service proposed in August 2000. Amendment 31 replaced the 1990 PETS language, quoted above from the 1990 Ozark/Ouachita VMEIS and incorporated into the Ouachita National Forest Plan as Amendment 3. Amendment 31's new PETS language made the acquisition of additional project-related PETS data more clearly discretionary with the Forest Service:

A biological evaluation of whether, and to what extent, a management action could affect any species federally listed as threatened, endangered, or proposed, under the Endangered Species Act (ESA), or designated by the Forest Service as sensitive, is prepared as part of environmental analysis for project-level decision making. The procedures for biological evaluations are found in Forest Service Manual 2670, *Threatened, Endangered, and Sensitive Plants and Animals.*

During the biological process to identify possible effects, existing available information will be used to determine the PETS species known or expected to occur in the vicinity of the proposed project or likely to be affected by the action. The information considered may include data on species/habitat relationships, species range distribution, and population occurrences developed from past field surveys or observations. Existing available information considered will also include the amount, condition, and distribution of suitable habitat.

For some PETS species expected to occur in the vicinity of the project, or likely to be affected by the project, additional field surveys conducted in suitable habitat that is potentially affected by the proposed project are desirable to document the presence or absence of these species. These field surveys would be most appropriate if past field surveys are not available for such areas and if they would provide more definitive information to improve the determination of effects to PETS species.

However, there are some PETS species and situations where information to determine potential effects to PETS species may not require field surveys. For these situations, the PETS species in question would be assumed to occur in the area if suitable habitat is present, and effects to the species would be considered in the effects analysis. These situations occur when:

1. There is a low likelihood of detecting a particular species; a field survey probably would not find that species and therefore could not provide definitive information for excluding a species being considered for protection.

2. Established Forest Plan direction or mitigation that effectively protects PETS species expected to occur in suitable habitat in the project vicinity is already in place and is part of the proposed action.

3. Habitat requirements of a PETS species are well known and (a) there is sufficient evidence that the proposed actions would have only short- or long-term beneficial effects or no adverse effects to PETS species or (b) any expected adverse effects of the proposed actions would not likely cause it to

be Federally listed or to suffer reduced viability.

[ONF Forest Plan Admin. Rec. I, tab 15, at 2].

In connection with Amendment 31 and pursuant to NEPA, an environmental assessment was prepared. The EA stated that the "purpose and need" for Amendment 31 were to clarify the Forest Plan's PETS-related requirements following *Martin*. Although the language of Amendment 31 made the PETS data collection requirement more flexible, the EA concluded that the amendment would have no significant impact on humans or protected species. The EA reasoned that "This amendment does not diminish the requirement for 'adequate population inventory'" but instead simply "allow[s] the Forest Service to focus on collecting data on those species for which sufficient data are lacking." [ONF Forest Plan Admin. Rec. I, tab 15, at 4]. The Forest Service issued a Finding of No Significant Impact ("FONSI") on July 12, 2000 and found that an environmental impact statement would not be needed for Amendment 31. *Id.* at 7.

### E. *Filing of the Chattooga Case*

On July 26, 2001 Plaintiffs filed their complaint in the companion case *Chattooga Conservancy et al. v. Robert Jacobs, et al.,* Civil Action No. 1:01–cv–1976–ODE (N.D.Ga.). Plaintiffs' primary argument was that Amendment 31 diluted the 1990 PETS requirements and contravened the 1990 Ozark/Ouachita VMEIS, which remained in effect. Plaintiffs also complained that by not acknowledging the PETS provision of the 1990 VMEIS at all in the environmental assessment for Amendment 31, the Forest Service had arbitrarily and capriciously avoided its NEPA duty to consider fully the environmental ramifications of a proposed action.

The meaning of the 1990 PETS data collection language and the new PETS language in Amendment 31 is crucial to a number of Plaintiffs' claims in this case. For the reasons explained in the Court's order in the companion case *Chattooga Conservancy et al. v. Robert Jacobs, et al.,* Civil Action No. 1:01–cv–1976–ODE (N.D.Ga.), the Court concludes that Amendment 3 and the language in the 1990 VMEIS were intended to protect PETS from adverse effects of a particular "vegetation management method" and that the Forest Service had never intended the term "population inventory information" to require an automatic "head count" or census of all PETS in a proposed project area. As described in the companion order, the Court finds that Amendment 31 was not a significant change but rather was indeed a clarification of the Forest Service's original intent regarding the meaning of the PETS data collection language in the 1990 Ozark/Ouachita VMEIS and Amendment 3. The reasoning and determination of *Chattooga* on this issue is adopted in this Order.

### F. *Further Developments*

In August of 2001, Defendants published a notice of their intent to supplement the 1990 Ozark/Ouachita VMEIS so as to delete the reference to a pre-project inventory of PETS population.

In December 2001, the Forest Service changed the list of MIS species for the Ouachita National Forest by adopting Amendment 33 to the Forest Plan. [Am. 33 ROD; ONF Forest Plan Admin. Rec. I, tab 17]. The new MIS list includes only 27 species: 14 stream fishes, 3 lake/pond fishes, 7 terrestrial vertebrates (six of which are birds), and 3 plants. The Forest Service explained that the changes were due to (1) the realization that some of the original MIS species were either totally

absent from or extremely rare in the Ouachita National Forest, making them unreliable and impractical indicators of overall wildlife health; and (2) the fact that several species not on the original list could be effective substitutes for those being removed.

The Forest Service issued a Supplement to the 1990 Ozark/Ouachita VMEIS on October 25, 2002. The Supplement stated an effective date of November 15, 2002. The new PETS wording in the supplement stated:

A Biological Evaluation of how a project may affect any species Federally listed as threatened, endangered or proposed, or identified by the Forest Service as sensitive *shall be* done as part of the site-specific environmental analysis. This evaluation considers available *information on* threatened, endangered, proposed, and sensitive species populations and their habitat for the proposed treatment area.

[ONF Forest Plan Admin. Rec. I, tab 19, at 2]. (emphasis in original). The effect of this supplement was to delete from the 1990 Ozark/Ouachita VMEIS any mention of PETS "inventory" or further collection of PETS data and to state that "available [PETS] information" would be considered to determine the effect of a project on PETS.

At the same time that the Supplement to the VMEIS was adopted, Amendment 31 to the Ouachita Forest Plan was replaced with Amendment 35 (October 2002; effective November 15, 2002). Whereas Amendment 31 had emphasized guidelines for collecting new PETS data and also made the decision to collect new data more clearly discretionary, Amendment 35 simply stated:

A biological evaluation of how a project *may affect any* species Federally listed as threatened, endangered or proposed, or identified by the Forest Service as

sensitive *shall be* done as part of the site-specific environmental analysis. This evaluation considers available *information* on threatened, endangered, proposed and sensitive species populations and their habitat for the proposed treatment area. (Emphasis in original).

[ONF Forest Plan Admin. Rec. I, tab 19].

Plaintiffs filed a timely administrative appeal of the approval of the Supplement to the 1990 VMEIS, which ultimately was rejected in a ruling by the Chief of the Forest Service on July 10, 2003. Plaintiffs assert that the 2002 Supplement to the VMEIS was invalid under NEPA for a number of reasons, principally because it did not take a "hard look" at the change to the PETS data collection language in the 1990 VMEIS.

### G. *Approval of Projects in the Ouachita National Forest*

In mid–2002, the Forest Service approved five projects in the Ouachita National Forest which are challenged in the instant lawsuit. These projects were (1) Gafford Creek Watershed project; (2) Kinsey Ecosystem project; (3) Middle North Fork of the Ouachita River project; (4) Kingdoodle Ecosystem Management project; and (5) Logan Side Ecosystem Management project. At the time these projects were approved, Amendment 31 to the Ouachita Forest Plan was still in effect; the 1990 VMEIS had not yet been supplemented, nor had Amendment 35 replaced Amendment 31. Amendment 33, reducing the number of MIS, was also in effect at the time the projects were approved.

The five projects variously included differing amounts of timber harvest, wildlife stand improvement, temporary road construction, prescribed burning, reforestation, commercial thinning, and various wildlife habitat improvement measures, *e.g.,* pond construction. Each project cov-

ered several thousand acres. The Forest Service prepared a biological evaluation and an environmental assessment for each of the five project. Each of the five environmental assessments determined that the project would have no significant impact on the human environment and that therefore no environmental impact statement was required. The District Ranger issued decision notices approving each of the projects.[7]

Plaintiffs timely filed administrative appeals as to all of the projects. The language of all these appeals, as to the claims of data deficiencies for MIS and PETS, was identical and said:

> The Project Activities are likely to jeopardize the viability of species that find optimal habitat in interior forests on the Ouachita National Forest.... These include threatened, endangered, and sensitive species, as well as management indicator species. These species include the gray squirrel, Indiana bat, pine warbler, worm-eating warbler red-eyed vireo, Acadian flycatcher, ovenbird, pileated woodpecker, as well as plant species. Of those bird species listed, several have exhibited statistically significant population declines since 1996, including the Acadian flycatcher, ovenbird, loggerhead strike (sic), and pileated woodpecker.

> For many of these species, the Forest Service has no up-to-date population data describing population numbers, locations or trends nor monitoring data on which the agency can rely to determine that the actions proposed in the context of Project activities will maintain num-

bers and distribution of these species sufficient for issuing long term viability.

\* \* \* \* \* \*

The District has not performed site-specific surveys for or obtained current population or inventory data on all the Threatened, Endangered, or Sensitive species which may inhabit these areas. Nor has the District performed site-specific surveys for or obtained current population or inventory data on all the MIS in these planning areas. Nor are there adequate site-specific surveys and inventory data on the status and health of the aquatic species and biological communities in the streams in the project areas.

*See, e.g.,* Gafford Creek Admin. Rec. II, tab 17; Kinsey Ecosystem Admin. Rec. II, tab 30; Logan Side Admin. Rec. II, tab 29.

Of those species named in the administrative appeals only the Indiana bat (PETS) and the Pileated Woodpecker (MIS) were PETS or MIS species for the Ouachita National Forest in the relevant time frame. The species named in Plaintiffs' administrative appeals are largely different from the species Plaintiffs now state (in the summary judgment briefs) are relevant.

## II. LEGAL ANALYSIS

### A. *Plaintiffs' Claims*

Plaintiffs' Second Amended Complaint makes four claims. Count I alleges that Defendants are violating the NFMA regulations concerning MIS, because Defen-

7. [Gafford Creek Admin. Rec. II, tab 13; Kinsey Ecosystem Admin. Rec. II, tab 20; Middle North Fork Admin. Rec. II, tab 21; Kingdoodle Admin. Rec. II, tab 20; Logan Side Admin. Rec. II, tab 25]. A "decision notice" is a concise written record of a Forest Service official's decision on a particular matter based upon an environmental assessment and a finding of no significant impact. 36 C.F.R. § 215.2. A "finding of no significant impact" or "FONSI" is the determination that a full environmental impact statement is not required. 40 C.F.R. § 1501.4; *Dep't of Transportation v. Public Citizen,* 541 U.S. 752, 124 S.Ct. 2204, 2209–10, 159 L.Ed.2d 60 (2004).

dants are "implementing the [Ouachita Forest Plan], through these projects and timber sales, without gathering, keeping current and considering quantitative data and trend data on all MIS." [Pls.' 2nd Am. Compl., ¶ 31]. Plaintiffs contend this failure exists both forest-wide and in individual project areas.

Count II alleges that Defendants are violating the provisions of the Ouachita Forest Plan by failing to collect required quantitative data for MIS.

Count III alleges that Defendants have violated the Ouachita Forest Plan (and therefore NFMA) by approving the five projects despite the absence of "adequate population inventory information" for PETS species in both the Forest as a whole and in the project areas. Count III also alleges that Defendants violated NEPA by failing to prepare environmental impact statements for amendments to the 1990 Ouachita Forest Plan and because the amendments were inconsistent with the 1990 VMEIS. Plaintiffs similarly argue that the 2002 Supplement to the VMEIS violated NEPA because it did not take a "hard look" at the environmental effects of the amendment/supplement.[8]

Count IV alleges that Defendants violated NEPA in approving the five projects despite the fact that they allegedly violated NFMA and because the Findings of No Significant Impact for the projects were arbitrary and capricious.

**B.  *Standard of Review***

■  "Neither NFMA nor NEPA provides a cause of action." *Tulare County v. Bush*, 306 F.3d 1138, 1143 (D.C.Cir.2002); *see also Lujan v. National Wildlife Federation*, 497 U.S. 871, 872, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). As such, the Administrative Procedure Act ("APA"), 5

---

**8.**  It is not entirely clear that Plaintiffs intend to assert NEPA-based claims as part of Count III. The Court will assume that NEPA claims are asserted. With respect to each of these claims, the Court adopts the rulings made in the *Chattooga* companion case. Thus, the Court finds that Amendment 31 was valid. Plaintiffs' claims challenging the 2002 VMEIS Supplement and Amendment 35 are dismissed without prejudice. As discussed with respect to the two site-specific projects in *Chattooga*, these claims are not ripe for adjudication.

Amendments 35 and the 2002 Supplement to the VMEIS became effective on November 15, 2002. The five projects Plaintiffs challenge here were all approved prior to that date. In the cases of four of the five challenged projects, Plaintiffs' administrative appeals were also rejected prior to November 15, 2002. The fifth project, the Kinsey Ecosystem Project, was approved in September 2002, but Plaintiffs' administrative appeal was not rejected by the Regional Forester until December 12, 2002, after the effective date of Amendment 35 and the 2002 VMEIS Supplement. Even so, Plaintiffs' claims related to the 2002 VMEIS Supplement and Amendment 35 are not ripe in relation to the Kinsey project because the amendment and supplement were not argued or considered at any time during the Kinsey project's approval.

"An [administrative] appeal [of a Forest Service decision] must...State how the...appellant believes the decision violates law, regulation, or policy." 36 C.F.R. § 215.14(b)(2002). In reviewing the appeal, "[t]he Appeal Reviewing Officer's review of decisions...focuses on decision documentation developed by the Responsible Official in reaching the decision, issues raised in the appeal, and *comments submitted by interested* parties." 36 C.F.R. § 215.19(b)(2002). Plaintiffs' administrative appeals of the Kinsey project made no mention of Amendment 35 or the VMEIS Supplement, likely because the decision to undertake the Kinsey project occurred prior to these amendments. Similarly, the Appeals Reviewing Officer affirmed the Kinsey project approval pursuant to Amendment 31 and the 1990 VMEIS and without mention of Amendment 35 or the VMEIS Supplement. [Kinsey Ecosystem Admin. Rec. II, tab 41]. Neither party has ever suggested that the Kinsey Ecosystem project should have been evaluated or should now be evaluated pursuant to Amendment 35 and the 2002 VMEIS Supplement.

U.S.C. § 701–706 provides the standard of review for all of Plaintiffs' claims. *Sierra Club v. Martin,* 168 F.3d 1, 5 (11th Cir.1999)(applying "arbitrary and capricious" standard to substantive NFMA claims); *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 376, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (applying APA standard to NEPA lawsuits); *North Buckhead Civic Ass'n v. Skinner,* 903 F.2d 1533, 1538 –1539 (11th Cir. 1990)("We, therefore, adopt the arbitrary and capricious standard when reviewing agency action in NEPA cases; if the agency action was not arbitrary or capricious, it should not be set aside").

▮▮▮ The APA's standard of review is highly deferential: under the APA, agency action must be affirmed unless that action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). To assess whether the agency acted arbitrarily or capriciously, "the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.* In the case of NEPA, a court's duty is not to guarantee any particular outcome, but rather only "to ensure that the agency took a 'hard look' at the environmental consequences of the proposed action." *Sierra Club v. U.S. Army Corps of Engineers,* 295 F.3d 1209, 1216 (11th Cir.2002).

### C. *Exhaustion of Administrative Remedies*

In order to invoke the APA to challenge agency action, a litigant must first exhaust any administrative remedies made explicitly mandatory under the relevant substantive law. 5 U.S.C. § 704; *Darby v. Cisneros,* 509 U.S. 137, 154, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993). The exhaustion requirement promotes judicial efficiency by allowing an agency to exercise its discretion and apply its expertise prior to judicial involvement. *McKart v. United States,* 395 U.S. 185, 194, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969). Congressional intent determines whether the exhaustion requirement applies to a particular challenge to government action. *Patsy v. Board of Regents,* 457 U.S. 496, 502 n. 4, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982).

Plaintiffs were required to exhaust administrative remedies prior to challenging the Forest Service in court. The U.S.D.A. Reorganization Act of 1994, section 212(e) provides that "a person shall exhaust all administrative appeal procedures established by the Secretary or required by law before the person may bring an action in a court of competent jurisdiction against (1) the Secretary; (2) the Department; or (3) an agency, office, officer, or employee of the Department." 7 U.S.C. § 6912(e).[9] The Forest Service is a division of the Agriculture Department. Thus Congress has placed an explicit, statutory exhaustion requirement on challenges to Forest Service activities, including lawsuits alleging that a Forest Plan was adopted in violation of NEPA. *See, e.g., Kleissler v. U.S. Forest Service,* 183 F.3d 196 (3rd Cir.1999).

A review of the administrative appeals filed by Plaintiffs reflects that the claims asserted in Counts I–IV were properly

---

**9.** 36 C.F.R. § 215.21 advises that "unless waived in a specific case, it is the position of the Department of Agriculture that any filing for Federal judicial review of a decision subject to review under this part is premature and inappropriate unless the plaintiff has first sought to invoke and exhaust the procedures available under this part."

raised, but the parts of these counts asserting data deficiencies for PETS or MIS are viable only as to the species named in the administrative appeals. Because only two of them, the Indiana Bat (PETS) and the Pileated Woodpecker (MIS) were PETS/MIS for the Forest within the relevant time frame, only these two will be eligible for merits consideration.

■ The purpose of the exhaustion doctrine is to ensure that the agency has the opportunity to address objections and correct errors prior to judicial involvement. *McKart v. United States,* 395 U.S. 185, 194, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969). Given that there are over one hundred MIS and PETS species in the Ouachita National Forest, Plaintiffs' general administrative objections to a lack of sufficient data or monitoring information cannot suffice to put the agency on notice about specific objections to the Forest Service's data on specific unnamed species. Instead, Plaintiffs' objections seem to have functioned more as a place marker so that Plaintiff might later look for data deficiencies to challenge in court.

"[A]dministrative proceedings should not be a game or a forum to engage in unjustified obstructionism by making cryptic and obscure reference to matters that 'ought to be' considered and then, after failing to do more to bring the matter to the agency's attention, seeking to have that agency determination set aside in Court." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 553, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). Accordingly, the Court considers Plaintiffs' species-specific challenges only with respect to species Plaintiffs mentioned by name in their administrative appeals, i.e. only with respect to the Indiana Bat and the Pileated Woodpecker.

## D. *Ripeness*

Before proceeding to analyze Plaintiffs' claims, the Court must also consider the issue of whether each claim is ripe for adjudication. In *Ohio Forestry Association v. Sierra Club,* 523 U.S. 726, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998), the Supreme Court held that because Forest Plans are broad, programmatic documents which represent "tools for agency planning and management", an attack on a Forest Plan is not ripe for review until it is presented in the context of a specific proposed project wherein the end product of the plan is presented in a concrete way. At the same time the Court stated in dicta, "Because NEPA, unlike NFMA, simply guarantees a particular procedure, not a particular result a person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper." *Id.* at 737, 118 S.Ct. 1665. In this case, all of Plaintiffs' remaining claims are clearly ripe for decision because they are tied to the five projects which now are before the Court for review. It does not matter whether these claims are classified as substantive or procedural.

## E. *Merits Analysis of Plaintiffs' Claims*

Counts I, II, the remaining portion of Count III and Count IV will be considered on the merits.

### 1. *Challenges to MIS Data*

Counts I and II allege that Defendants arbitrarily and capriciously failed to meet their NFMA duty to inventory and monitor MIS species.[10] *See* 36 C.F.R. § 219.19, § 219.26. The only MIS species for which administrative remedies are exhausted is the Pileated Woodpecker.

---

**10.** In supplemental briefs requested by the Court, Defendants argue that the new NFMA regulations eliminating the regulatory re-

quirements for MIS monitoring are retroactively effective, and that therefore they could not have committed any MIS violations. De-

■ Plaintiffs' argument that Defendants were obligated by NFMA separately to collect MIS data within each of the five proposed project areas is rejected. This issue was settled by the Court of Appeals in *Sierra Club v. Martin*, 168 F.3d 1, 6 (11th Cir.1999)("We agree [with the Forest Service] that the [MIS inventory data] regulations refer to the formulation of Forest Plans rather than to specific projects proposed under already enacted Forest Plans"). *Martin* is binding on this Court and makes clear that the MIS regulations required data collection only at the Forest-wide level.

■ The Court also rejects Plaintiffs' claim that an alleged failure to collect head count or census data on MIS in the Forest violated the 1990 Ouachita Forest Plan. While *Martin* does call for "quantitative data," *Martin* in no way suggests that it is illegal for the Forest Service to use estimating procedures such as sampling or surveys to satisfy the MIS data requirements. In any case, the Ouachita Forest Plan calls for the use of sampling techniques rather than collection of census data for MIS, so the lack of head count or census data cannot be deemed a violation of the Plan. As discussed above, in 1994 Amendment 16 to the Ouachita Forest Plan removed the original requirement of annual measurement of Pileated Woodpeckers. As such, Defendants' failure to evaluate the woodpecker annually after that did not violate the Forest Plan.

If Plaintiffs are arguing that Defendants are guilty of wholesale failure to collect MIS data and to monitor MIS within the Ouachita National Forest, as was described in *Martin*, the Court finds that the evidence in the record does not support this claim. For the MIS for the Ouachita National Forest, the record does reflect that adequate "quantitative data" existed as required by *Martin*. *See* "A Summary and Analysis of Data Pertaining to Management Indicator Species for the Ouachita National Forest" (May 1, 2001). [Hereinafter "May, 2001 MIS Report", ONF Forest Plan Admin. Rec. VII].[11] Admittedly, the data is not "head count" or census data for all of the MIS in the two million-plus acres of the Ouachita National Forest, which Plaintiffs apparently argue should have been collected. Instead, there was sampling data for the fish MIS, numerical survey data for the vertebrate MIS (one deer and six birds), and descriptive reports on the three plant species (flowering dogwood, farkleberry, yellow lady's slipper). Plaintiffs have scant support for an argument that there was a

---

fendants are incorrect. "[C]ongressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). There is nothing in the new NFMA rules that explicitly states their retroactivity. Moreover, an agency lacks even the power to enact a retroactive rule where Congress has not explicitly granted the agency that power. *Wright v. Director, Federal Emergency Management Agency*, 913 F.2d 1566, 1572 n. 11 (11th Cir.1990)("the statutory grant of legislative rulemaking authority to an agency does not, as a general matter, encompass the power to promulgate retroactive rules unless expressly authorized by Congress"). Nothing in

NFMA suggests an intent to allow the Forest Service to retroactively revise its regulations.

11. In December 2001 Amendment 33 to the Ouachita Forest Plan reduced the number of MIS for the Forest from 77 to 27, including 17 fish, 7 vertebrates (including 6 birds), and 3 plants. [Am. 33 ROD, ONF Forest Plan Admin. Rec. I, tab 17. The Forest Service simultaneously released a Supplement to the MIS report to include data on the few species that were new MIS as of the adoption of Amendment 33. *See* "A Summary and Analysis of Data Pertaining to Management Indicator Species for the Ouachita National Forest: Supplement" (December 14, 2001). ONF Forest Plan Admin. Rec. I, tab 18].

wholesale failure to obtain quantitative MIS data as was the case in *Martin*.[12]

■ Turning to Plaintiffs' claim that insufficient quantitative data was collected for the Pileated Woodpecker to satisfy the *Martin* standard, the Court first notes its disagreement with Plaintiffs' contention in their brief that a lack of adequate quantitative data for even one MIS species in the Forest would mean that these projects could not proceed. Certainly, *Martin* does not so state, since that case involved a situation where the Forest Service had literally "no data for half of the MIS in the Forest". *Sierra Club v. Martin*, 168 F.3d 1, 7 (11th Cir.1999). Nonetheless, the Court will evaluate the evidence in the record to determine whether Defendants had sufficient quantitative data on the Pileated Woodpecker to satisfy *Martin* and whether Defendants' decisions approving the projects were otherwise arbitrary and capricious given the data on hand when the projects were approved.

The 1990 Ouachita National Forest Plan contains the following discussion of habitat for the Pileated Woodpecker:

Of the Forest vertebrates requiring mature hardwood and hardwood/pine types, the needs of the pileated woodpecker, a management indicator species, are perhaps the most exacting. Where habitat requirements for this species are provided, conditions will be suitable for those associated species occurring in these habitats. The required hardwood component per habitat unit (640 acres) for the pileated woodpecker is at least 100 acres, of which 60 acres must be 50 years of age to provide sufficient foraging habitat. Of this 60 acres, 25 acres must be greater than or equal to 100 years of age to provide sufficient nesting habitat. Where hardwoods 100 years of age do not occur, the oldest hardwoods will be designated as pileated woodpecker habitat. Hardwood habitat provided for the pileated woodpecker should suffice to meet mast needs of species such as deer, turkey and squirrel. In each habitat unit where hardwood or hardwood-pine stands are limited and where Pileated Woodpecker habitat is not a factor, a minimum of 100 acres of mast capability will be provided in key areas. Designation of pileated woodpecker habitat on a compartment basis will ensure adequate spatial distribution of pileated habitat, hardwood/hardwood-pine forest types and associated hard mast.

Note: The term "habitat unit" (640 acres) does not refer to a specific section of land, but rather to the number of units of land, 640 acres in size, that occur within a compartment unit. The number of habitat units per compartment is derived by dividing total compartment acres by 640 acres. Example: If a compartment contains 1,280 acres, it contains 2 habitat units. Thus, to meet pileated woodpecker habitat needs as described, a minimum of 200 acres of this compartment must be set aside in hardwood, hardwood-pine and/or pine-hardwood stands.

[Forest Plan, at IV–48].

The May 2001 MIS Report prepared by the Forest Service contains the following information as to the Pileated woodpecker:

---

**12.** The May, 2001 MIS report states that the Flowering (Florida) dogwood is "widespread", "abundant" and "thriving" in the Ouachita National Forest. [May, 2001 MIS Report at 111–113]. The report states that the Farkleberry has exhibited a "stable population." [May, 2001 MIS Report at 114–115]. These characterizations of two of the three MIS plant species may not qualify as "quantitative." Nonetheless these are only two of the twenty-seven MIS. *Cf.* May, 2001 MIS Report at 123–24 (offering quantitative data on the Southern Yellow Lady's Slipper, including reporting several known locations with greater than 100 individuals).

**Pileated woodpecker (*Dryocopus pileatus* )**

The pileated woodpecker ( *Dryocopus pileatus)* is an ecological management indicator species. It prefers dense, mature to overmature hardwood and hardwood-pine forest types, is a primary excavator of cavities important to obligate secondary cavity nesters, and is a key indicator for the retention of a complete community of cavity nesting species. The population objective indicated in Table IV—12 of the ALRMP is one pair per section for both minimum and optimum levels (USDA Forest Service.1990a).

**Data Sources:** The North American Breeding Bird Survey (BBS)(Sauer et al. 2000)(Appendix H), Phase II Research data (Appendix J), and habitat capability predictions using CompPATS (Appendix I) and CISC inventory data are sources used for evaluating pileated woodpecker population trends.

**Population Trends:** Population trend and habitat capability data are mixed. The BBS data indicate a significant downward trend of –2.1 percent in the period of 1966—1999, for the Ouachita Mountains.

The Phase II Research data on the occurrence and abundance of the pileated woodpecker within the pine and pine-hardwood forest types also indicate a downward trend for the pine and pine-hardwood types on the Forest (Figure 4–19).

\*    \*    \*    \*    \*    \*

The CompPATS estimated habitat capability using all forest types indicate an increasing trend (Figure 4–20). These data are for pine, pine-hardwood, hardwood, and hardwood-pine stands with the greatest value being for stands greater than of equal to 41 years old. As these stands age, the habitat capability to support the pileated woodpecker will continue to improve.

\*    \*    \*    \*    \*    \*

**Interpretation of Trends:** The downward trend of populations in pine and pine-hardwood forest types estimated by result of the Phase II research data are not unexpected since these forest types are the ones under active management. Thinnings and regeneration cutting have negative effects on the pileated woodpecker. The results from CompPATS which take into account conditions in the hardwood and hardwood-pine fores types as well as pine and pine-hardwood show an overall increase in habitat capability. CompPATS results offer the most complete picture of habitat conditions for the pileated woodpecker. The overall situation should continue to improve for this species as the unmanaged hardwood and hardwood-pine forest types age. Current levels exceed the ALRMP population objectives (USDA Forest Service.1990a). Its trend and population viability as a species should continue to be monitored.

**Implications For Management:** This species appears to be secure within the Forest. There are no indications of a need to alter management direction.

[May 2001 MIS Report, ONF Forest Plan Admin. Rec. VII, at 99–100].

The environmental assessment for the Gafford Creek Project [13] states the follow-

13. The Gafford Creek project includes roughly 1500 acres of timber harvesting, including harvesting 157 acres of modified seed tree, 240 acres of unevenaged management single tree selection and 1195 acres of commercial thinning. The project also includes related activities such as timber and wildlife stand

ing as to the project's effects on the Pileated Woodpecker: [14]

> ### Effects to the Pileated woodpecker (Dryocopus pileatus) and Scarlet tanager (Piranga olovacea)
>
> \*     \*     \*     \*     \*     \*
>
> ### Alternatives II–Proposed Action and III–No Seed Tree
>
> Alternative II and III would have no direct effect but could have a negative indirect effect if treatment occurred in the Gafford Creek Watershed. Thinning and regeneration cutting have been known to have a negative effect on the pileated woodpecker, although all alternatives meet optimum population levels with the habitat capability model. Minimum population objectives are met for the scarlet tanager with all alternatives. No cumulative effects are anticipated at this time.
>
> **Trends**–BBS and Phase II Research show a significant downward trend for the pileated woodpecker in pine and pine-hardwood types. Trends follow an increase in active management. Thinning and regeneration cutting have a negative effect on the pileated woodpecker. However, if these stands are allowed to age, the situation will improve accordingly. The same sources show a non-significant increasing trend for scarlet tanager populations on the Ouachita–Ozark Plateau where mature hardwood and mixed forest types are represented. There is a declining trend within the treated pine and pine hardwood habitat types. This year, 2002, there seems to be an increase in the number of Scarlet tanagers heard across the district in mature habitats. This could be due to any number of reasons. There has never been a tanager recorded on the annual breeding bird plots until this year. Although all alternatives exceed the minimum population objectives for the scarlet tanager and pileated woodpecker, activities associated with alternatives could contribute to a downward trend for the ONF.
>
> ### Mature Hardwood:
>
> The proposed actions will occur primarily in pine or pine-hardwood communities. No proposed action will convert these habitat types into other types. Temporary roads through these communities will have an insignificant impact. None of the three alternatives will affect the long-term persistence of any of the MIS in the mature hardwood forest types. For mature hardwood stands, the habitat capability model shows little difference in pileated woodpeckers or scarlet tanagers/mi2. The lack of treatments in hardwood stands will allow these stands to age, mature, and help to meet the Forest Plan objectives.
>
> ### Soft Mast producers in Pine and Pine–Hardwood forests:
>
> Alternative 1 provides no direct impact, but through aging and competition could have a negative indirect effect. Alternatives II and III may harm individuals and temporarily lower mast production, but should regenerate and have no long-term effect.

---

improvement and reconstruction and minor elongation of an access road. [Gafford Creek EA, Gafford Creek Admin. Rec. II, tab 12, at 9].

**14.** The Gafford Creek environmental assessment is quoted as illustrative of the discussion of the Pileated Woodpecker related to each of the five projects. The record also includes environmental assessments for the four other projects, each of which contains a nearly identical discussion of the project's effects on the Pileated Woodpecker. [Kinsey Ecosystem Admin. Rec. II, tab 17, at 34–35; Middle North Fork Admin. Rec. II, tab 12, at 48–51; Kingdoodle Admin. Rec. II, tab 15, at 32–35; Logan Side Admin. Rec. I, tab 16, at 28–32].

[Gafford Creek EA, Gafford Creek Admin. Rec. II, tab 12, at 38–39].

As the foregoing materials illustrate, Defendants' assessment of the environmental effects of the Gafford Creek project on the Pileated woodpecker was colored by the fact that the woodpecker has a strong habitat preference for very mature hardwood and hardwood-pine areas. The Gafford Creek Project involved harvesting exclusively in pine or pine-hardwood areas and thus only relatively minimal activities were planned in hardwood or hardwood-pine areas.

The North American Breeding Bird Survey, which was used as a data source by the Forest Service in its 2001 MIS report, determined that during the period from 1966 through 1999, Pileated woodpecker population had declined 2.1 percent in the Ouachita Mountains. [May 2001 MIS Report, at 99]. This is "quantitative data" per *Martin.* Under the procedures used in that survey (described in detail in Appendix H), birds are counted annually at fixed points within the forest. [May 2001 MIS Report, at 186]. While the North American Breeding Bird Survey presumably covers a very large geographical area, it includes data collection points within the Ouachita National Forest. The data recorded at the points within the Forest is in the record. [ONF Forest Plan Admin. Rec. II, tab 24].[15] The environmental assessments which were prepared for the five projects in this case do not cite the detailed underlying data, but do recite summaries. The Court disagrees with Plaintiffs' assertion that such underlying data does not "count" unless it is specifically set forth in the environmental assessment. There is no statutory or regulatory

requirement that the Forest Service do this.

Defendants have also presented Breeding Bird Survey data for the Ozark/Ouachita Plateau. [ONF Forest Plan Admin. Rec. II, tab 23]. Plaintiffs assert that it is inadequate to satisfy *Martin* because it represents a region much larger than the Ouachita National Forest. The Court notes that the regulation which requires "quantitative data" for MIS refers to a "planning area" which is defined in the regulation as *either* an area covered by a regional guide (like the 1990 VMEIS) or a forest plan. *See* 36 C.F.R. § 219.3. The Ozark/Ouachita Plateau is approximately double the size of the area covered by the Ozark/Ouachita VMEIS. Thus, in pointing out that the Ozark/Ouachita Plateau is "more than 10 times the area of the Ouachita National Forest", (Plaintiffs' Proposed Findings of Fact filed February 5, 2005, p. 2), Plaintiffs greatly exaggerate the extent to which the data offered is derived from studies covering a wider geographical area than the regulations have in mind. *Martin* does not suggest that the quantitative data considered by the Forest Service be data exclusively pertaining to the exact geographical contours of the "planning area." In any case, this data is accompanied by other quantitative data which *is* exclusively for the Ouachita National Forest. The Court finds that *Martin's* requirement of quantitative data is met for the Pileated Woodpecker.

Plaintiffs also complain that the data on the Pileated Woodpecker is not set forth in the biological evaluations for the five projects. Plaintiffs are correct that it is not; however, the biological evaluations are in-

---

**15.** Plaintiffs correctly point out that some of the data for the Forest post-dates the administrative review process; therefore, Defendants could not have considered it in reaching their decisions on the projects. However, even if

data for 2002 and 2003 is omitted, that still leaves numerical data for each bird observed at survey points in the Ouachita National Forest for 1997, 1998, 1999, 2000 and 2001. That is enough, in the Court's opinion.

tended to address the effect of the projects on PETS, not on MIS. *See* 1990 Ozark/ Ouachita VMEIS, at II–40 (requiring the Forest Service to "perform biological evaluation on all projects to determine possible effects on threatened or endangered species, or on species proposed for such listing, or on sensitive species"); Forest Plan at IV–13 (same). The environmental assessments did address the effects on MIS. They noted that despite the finding that the project activities would have a slight adverse effect on habitat available to the Pileated Woodpecker in pine or pine-hardwood forests, because the plans did not call for treatments in hardwood stands, and did not call for timber harvest in hardwood or hardwood-pine areas, the effects would be minimized.

More importantly, the environmental assessment for each project determined, after analyzing possible effects on *all* relevant management indicator species in the project areas, that the projects should proceed. Unlike in the case of PETS, there is no legal protection which extends to individual MIS species. Management indicator species are meant to gauge the effects of various planned or ongoing management activities on different groups of species. The bottom line for the analysis was that the project activities would not appreciably harm any of the MIS and that they would benefit others. MIS, unlike PETS, are not rare species such that a diminution of any one type means that a project should not proceed. Where species in a project area are diverse, it is unlikely that project activities will affect all MIS in the same way. This cannot be the basis for shutting down all project activities of any kind.

Plaintiffs criticize the environmental assessments for relying on COMPATS, Phase II research and the CISC study in projecting trends for the Pileated Woodpecker based on proposed habitat changes. They point out that these are "habitat studies", not "quantitative data" as stated under *Martin's* ruling. However, *Martin* did not reject all use of such studies. It merely held that the NFMA regulation, 36 C.F.R. § 219.26, required quantitative data which was missing in that case. *Martin*, 168 F.3d at 7. In this case quantitative data is not missing and it is complemented by studies which project what effect the proposed changes in vegetation would have on the ability of the project areas to support MIS.

### 2. *Challenges to PETS Data*

■ Count III alleges that Defendants' approval of the five projects was arbitrary and capricious because "the Forest Service did not perform and did not have population inventories for all PETS species in the Ouachita National Forest, at the forest-wide level or in the project areas." [Pls.' 2nd Am. Compl., ¶ 41]. Plaintiffs' claim is brought under NFMA and the *Martin* decision.

To the extent that Plaintiffs are arguing categorically that Defendants failed to have adequate data for all PETS in the Ouachita National Forest, that claim fails. Plaintiffs have made no effort to substantiate this claim with evidence and have not briefed it in response to Defendants' motion for summary judgment. Indeed, Plaintiffs contradicted the premise of this general claim by stating in their brief in response to Defendants' motion for summary judgment that "the Court need not determine the adequacy of the data on any species other than those challenged by Plaintiffs." [Pls.' Rep. Brief, Dock. No. 149, at 17, fn. 5]. Plaintiffs' brief then challenges the data for seven PETS species and does not challenge all PETS data offered by Defendants. The Court considers that any categorical claim that all Forest-wide PETS data was inadequate has

been abandoned, if indeed such a claim was intended to be asserted.

The Court turns now to Plaintiffs' claim that Defendants' approvals of the five projects were arbitrary and capricious under NFMA because the Forest Plan required that the Forest Service collect more "population inventory information" on specific PETS within the proposed project areas before approving the projects. Although Plaintiffs' complaint did not single out particular species in relation to this claim, Plaintiffs' brief challenges Defendants' data only for the following PETS species: Diana Fritillary (with respect to all 5 projects), Caddo Mountain Salamander (Kinsey project), Kiamichi Shiner (Logan Side project), Paleback Darter (Kinsey project), Bachman's Sparrow (Logan Side and Middle North Fork projects); Indiana Bat (Gafford Creek project). [Pls.' Prop. Findings of Fact on Motion for Prelim. Inj., Dock. No. 106, at 15–18; Pls.' Rep. Brief, at p. 18–30]. As described above in Part II.C., only the Indiana Bat for the Gafford Creek Project qualifies for analysis, because Plaintiffs did not exhaust administrative remedies as to the other species named in Plaintiffs' brief.

The 1990 Ouachita Forest Plan contained the following statement concerning the Indiana Bat's presence in the Forest:

Two species of endangered bats, the Indiana bat (Myotis sodalis) and the gray bat (Myotis grisescens) were previously listed as possibly occurring on Forest. Recent studies on the Forest's bat fauna have been completed in both Arkansas and Oklahoma. These studies included extensive mist netting of riparian areas and examination of known caves and abandoned mining drifts. Neither species was found.

\* \* \* \* \* \*

The Indiana bat also uses caves as hibernacula, but examination of caves and abandoned mining drifts did not reveal

use by this species which has very narrow microclimate requirements. One specimen discovered hibernating in nearby Pushmataha County, Oklahoma, and reported in 1959, is generally considered a waif. There are no records of the Indiana bat occurring south of the Arkansas River in Arkansas. Data collected in other portions of the state where bats range indicates that the bat does establish maternity colonies within snags located in riparian areas. This is often some distance from hibernating caves, indicating this species should be considered to possibly occur on Forest lands during the maternity period, May–August. Snags used by two maternity colonies in Illinois, were of tree species commonly found in riparian areas of the Forest in both Arkansas and Oklahoma. Standards and guides of Management Area 9 will adequately protect riparian areas potentially used by this species, should it occur.

[Forest Plan, at IV–41].

The original biological evaluation for the Gafford Creek Project concluded that the project "May Affect/ [is] not likely to adversely affect" the Indiana Bat. The biological evaluation explained this finding as follows:

**Potential Effects on PETS Species and Habitat**

At this time no Proposed, Endangered or Threatened species are found to inhabit or are potentially affected by the proposed activities or alternative action activities associated with the Gafford Watershed; however, based on a literature review, the following plants and animals could potentially be present in the general area.

\* \* \* \* \* \*

2.) The Indiana Bat was listed as Federally endangered to the Endangered Species Preservation Act on March 11, 1967.

The Indiana Bat (Myotis sodalis) is a medium sized, monotypic species of the genus Myotis that is known to occur in much of the eastern half of the United States. In Arkansas, this species has been found only in the region of the Ozarks and never in the Arkansas River Valley or the Arkansas portion of the Ouachita Mountain Ecoregion.

The Indiana bat is known to roost in the snags of 23 tree species (21 hardwood—2 pines) and rarely roosts in living trees. Twelve (12) of these 23 have been designated as Class I trees which means they are likely to develop the loose exfoliating bark, preferred by Indiana bats for roosting sites, as they age and die. Class I trees include silver maple, bitternut hickory, eastern cottonwood, white oak, shagbark hickory, green ash, red oak, slippery elm, shellbark hickory, white ash, post oak and American elm. Many of these species are found in stream valleys and lowlands and are infrequently encountered in upland pine and pine-hardwood timber stands where the dominant tree species is shortleaf pine and the one of commercial value. The east-west orientation of the Ouachita Mountains provides for very distinct north and south slopes with hardwoods vegetating north slopes and riparian areas, and pines occurring primarily on the more xeric south slopes. The majority of the most suitable Indiana bat habitat on the Ouachita National Forest is located on north slopes where larger Class I hickories and oaks occur and dominate stands. These species also occur in protected riparian buffer zones located either side of all intermittent and perennial streams where harvest is prohibited. The ONF does not have a commercial hardwood timber sale program and harvest will not occur in hardwood and hardwood-pine forest types. Therefore, the vast majority of the hardwood component of the watershed valu-

able to Indiana bats will be retained. This percentage of hardwood exceeds the recommended retention of older hardwoods and does not include those hardwoods that occur in south slope pine stands. Hardwoods available on south slopes could compose up to 30% of timber in pine and pine-hardwood sites, offering far fewer roost opportunities. Of the 12 Class I tree species, white and post oaks are most likely to occur in pine stands scheduled for seed-tree and commercial thinning harvests, with these species and red oaks occurring much more frequently and of larger size in protected drains and north slope hardwood communities.

Timber harvest of shortleaf pine over 9″ dbh has the potential to destroy potential roost sites. However, pine trees in this size range and above are abundant and well distributed over the watershed and district and are unlikely to be a limiting factor in roost availability. During any timber harvest operation the likelihood of cutting a tree containing a maternity colony or individual roosting Indiana bat is anticipated to be extremely low. This is due to the large number of suitable roost trees present on the ONF, the rarity of this bat species, the wide dispersal of Indiana bats and maternity colonies throughout the species' range, and the fact that there have been no maternity colonies found in Oklahoma or Arkansas on the ONF or other public or private lands in these two states (USFWS, 1999). Where they do occur, most Indiana bats roost in dead or dying trees. Few maternity colonies have been located in tree cavities with most primary maternity roosts situated under exfoliating bark. The ability of the tree species to produce exfoliating bark probably influences Indiana bat use. Exfoliating bark on living shortleaf pines in the Ouachita Mountains occurs as small

individual pieces of bark and not as sheets or slabs that allow for multiple animals to form small colonies. Maternity roosts most commonly are located in bottomland or riparian areas, however they occasionally have been located in pastures and upland hardwoods. Indiana bat roosts have been commonly found among mixed mesophytic hardwood and hardwood-pine habitat types. Some have been reported in riparian and upland habitat and on occasion in pine dominated forests (Menzel et al, 2001). The direct effects of timber harvest and Wildlife Stand Improvement—Overstory Development may involve incidental take of Indiana bats if trees are harvested during the active period of the year when individuals or small colonies utilize non-cave habitats. However, due to the known low incidence of Indiana bats on the Forest and the existing measures the Forest has taken to reduce the probability of direct bat mortality, the USFWS believes that taking of Indiana bats will be unlikely (USFWS, 1999). Indirect effects of timber harvest and WSI–Overstory Development will be the removal of some potential roost trees, but will also result in the spacing of residual trees to encourage their growth. The spacing of trees will also allow for the proliferation of herbaceous and shrubby ground cover and the probability of enhanced insect populations. In addition, areas of reduced clutter will be available for foraging activities.

Cumulative effects of timber harvest and WSI–Overstory will be to provide foraging areas of reduced clutter and potentially enhanced insect populations spatially distributed over the watershed. In the long term, these actions will result in the production of larger diameter trees, many of which will provide bark suitable for use by this species.

There will be no direct effects on the Indiana bat from site preparation/pre-commercial thinning/croptree release. Vegetation treated in these activities will not affect roosting opportunities for the Indiana bat because vegetation is of a very small dbh. Indirect effects will include enhanced potential for more diverse and abundant insect populations as the basal area of stems is reduced and a flush of herbaceous growth occurs. The cumulative effects will be to enhance foraging opportunities of the watershed where crown closure in recent years had reduced habitat conditions (early forest stage cover) for insects dependent upon herbaceous vegetation. This habitat condition is rare within the watershed.

The proposal to generate 8 acres of temporary openings in pine stands during harvest activities may not be pursued because of the early forest stage cover provided beneath seed-tree harvest areas. In the event these openings are produced, direct effects on the Indiana bat will be similar to those for timber harvest. The indirect effects would be the development of completely clutter-free foraging habitat and a flush of vegetation that typically is not readily available within the watershed. The cumulative effects will be minor because this activity will occur on a small percentage of the watershed land-base.

There will be no direct effects on the Indiana bat from dormant season prescribed burns. The only known Indiana bat hibernaculum on the ONF is Bear Den Cave located in southeastern Oklahoma. The indirect effects of prescribed burns will be to reduce the amount of understory vegetation that inhibits free bat movement and foraging activity by maintaining uncluttered foraging pathways and easier access to roost trees. The cumulative effects of prescribed fire will be substantial because the entire watershed will be

burned in portions during the 10–year period covered by this document. The variety of fire intensities that will occur due to environmental conditions will provide for a habitat mosaic with varying degrees of removal and occasional overstory tree mortality.

The direct effects on Indiana bats from temporary road construction will be similar to those described for timber harvest and WSI–Overstory Development. The indirect effects will be to provide openings in the canopy to be used as flight paths and foraging areas. The cumulative effects of road construction will be minimal due to the very small acreage involved.

The use of skid trails and the re-opening of closed, but already existing roads will have no direct effects on the Indiana bat. The indirect effects will be to provide for additional clutter-free foraging areas when vegetation (primarily brush and saplings) is cleared from the existing roadbeds. The cumulative effects will be minimal because of the small acreage involved but important by providing openings through otherwise closed canopy situations that dominate older stands.

The excavation of 8 wildlife ponds will occur on very small parcels of land, most typically involving less than 0.5 acre per site in upland areas, for a total of 4 acres. These areas are permanently removed from the acreage available to grow trees but are extremely important in the Ouachita Mountains where xeric conditions occur during summer months and many stream channels become dry. The direct effects of construction will be similar to those described for timber harvest and WSI Overstory Development with regard to incidental take and roost tree loss. The indirect effects will be to provide reliable sources of drinking water and areas where aquatic insect populations may breed. The cumulative effects will be to make water available over the entire watershed encouraging use of various habitat conditions for foraging by this species.

The non-discretionary Terms and Conditions of the Biological Opinion, as outlined on Pages 20–23, implement the Reasonable and Prudent Measures that must be undertaken for the Forest Service to be exempt from Section 9 of the Endangered Species Act. Most of these terms and conditions are performed routinely as standard operating procedures and had previously been incorporated into Forest-wide Standards and Guidelines in the ALRMP (USDA–FS, 1990a) and Vegetation Management documents (USDA–FS, 1989, 1990b). Of these seven (7) listed terms and conditions, the following portions are not applicable to resource management activities on the Fourche Ranger District because these habitat features are not present: 3a,b—hibernacula (caves) and fall swarming areas, and 5a—cave site surveys. Implementing the applicable Terms and Conditions will insure that forest management and other activities authorized, funded, or carried out on the ONF are not likely to jeopardize the continuing existence of the Indiana bat (USDI–USFWS, 19996). Copies of the Indiana bat Biological Opinion have been made available to all district resource managers involved in on-the-ground activities that could potentially affect this species. The ONF complied with the terms and conditions associated with the Indiana bat biological opinion in the past years. Forest biologist, Jerry Davis, says we have kept below the acres of activities associated with take since 1999.

Spring, summer and fall roosting habitat for this species has primarily occurred as snags with exfoliating bark, or living trees that have exfoliating bark, the shagbark hickory in particular. Many

of the snags used by this bat have been of species found throughout much of the Ouachita National Forest and include red, white and post oaks. Random trees of this between 11 and 20 inches diameter are found in timber stands designated to contain immature sawtimber and sawtimber-sized trees. District-wide there are thousands of acres of hardwood and pine forest types that fit these categories and have the potential to contain snags of appropriate size and species. There are no threats to the Indiana bat from the proposed project or the alternatives; however, the BO concedes if mitigation measures are met then the determination must be "Not likely to Adversely Affect" based on possible Indiana bat habitat manipulation and take.

\*　　\*　　\*　　\*　　\*　　\*

A. Proposed, Threatened and Endangered Species

___X___ May affect; not like to adversely affect (Indiana bat)

\*　　\*　　\*　　\*　　\*　　\*

VIII. Conclusion

It is my conclusion that the proposed actions associated with the Gafford Watershed on the Fourche Ranger District will have the determination of "No Effect" on all Federally Proposed, Endangered or Threatened species, with the exception of the Indiana bat which will be "Not likely to adversely affect" based on potential habitat.

[Gafford Creek BE, Gafford Creek Admin. Rec. I, tab 6, at 12–16, 22–23]. In 2002, the Gafford Creek biological evaluation was amended to change the finding of "Not likely to adversely affect" the Indiana Bat to a finding of "No Impact" on the Indiana Bat. That change was explained as follows:

Amendment to Gafford Creek Watershed Timber Sale Biological Evaluation Signed on 6/17/2002

Amending: The original determination for the Indiana bat (Myotis sodalis) in the Gafford Creek Watershed Biological Evaluation (BE) for the proposed action and alternative actions was "May affect; not likely to adversely affect". Although the actions were considered to have no direct, indirect or cumulative effects to this species, the wording in the Biological Opinion was interpreted to consider all effects to the Indiana bat to be "may affect; not likely to adversely affect" even though forest-wide trapping has never found this species in the Arkansas section of the Ouachita National Forest and we have kept within the acres of activity guidelines set forth in the BO. The activities of this proposal include harvesting of timber, wildlife stand overstory improvements, temporary openings, pond building, prescribed burning and temporary road construction. The following paragraphs officially change the determination to "No Effect" to the Indiana bat during activities associated with the Gafford Watershed.

Indiana bats hibernate in limestone caves, preferably with pools of water. In summer, habitat consists of wooded or semi-wooded areas, mainly along streams (NatureServe, 2001). Solitary females may even bear offspring in hollow trees or under loose bark of living trees. Summer roosting males may use oaks, hickories or various elm barks for cover, most often near maternity roosts (Harvey, 1992).

There are no documented occurrences of the Indiana bat on the Fourche Ranger District. Areas on the district were surveyed several times in the late 1980's and this bat was not found (Saugey and Heidt, 1989). No known caves or mines

exist that could be used as hibernaculums on the district, nor have any summer maternity roosts been found (Saugey, personal communication, 2001). The Indiana bat does occur on the neighboring Ozark National Forest and in the Ouachita National Forest in Oklahoma. Implementation of Forest snag retention standards and guides, as well as undisturbed habitat, should provide adequate roosting habitat for summer male bats. In addition, the ice storm of 2000 has created many new snags and damaged trees that may be of future use.

The Indiana bat falls under the directives of Amendment 31 of the ALRMP, for the Ouachita National Forest, as well as protection measures established in the Indiana Bat Recovery Plan (USFWS 1996) and the Biological Opinion concerning the impacts of continued forest management activities in the Ouachita National Forest, which was issued on April 26, 1999. All Reasonable and Prudent Measures, Terms and Conditions, and the Conservation Recommendation concerning timber harvest will be followed.

Surveys will not be conducted for this species. Proposed and alternative activities should have no direct, indirect or cumulative effects on habitat as long as guidelines are followed. Due to the lack of hibernacula, no known occurrences and efforts in habitat retention, the determination will be "No Effect" on the Indiana Bat from proposed or alternative actions.

[Gafford Creek BE, Gafford Creek Admin. Rec. II, tab 16].

As the Gafford Creek biological evaluation demonstrates, the Forest Service's primary basis for its finding of "no impact" on the Indiana Bat was the absence of caves "hibernacula") documented for the bat in the District; the fact that the bat had never been documented in the Arkansas part of the Forest where the projects are located; and the fact that the bats do not typically nest in the trees being cut as part of the project. Despite these findings, Plaintiffs' argument is that under Amendment 3 of the Ouachita Forest Plan and *Martin*, Defendants were required to try to count any Indiana bats in the Gafford Creek project area before seeking approval of that project, even though it was relatively certain that no bats would be found and even though the proposed management activities would have no effect on the bats if any were present.

Plaintiffs' argument is contrary to *Martin*. *Martin* only held that where there was a wholesale failure to obtain "adequate population inventory information" on PETS admittedly present in the project area (which PETS would be adversely affected by the projects), the projects could not proceed. *Martin*, 168 F.3d at 4–5. Neither *Martin* nor Amendment 3 required that a headcount or census of all PETS be taken in any event. Neither required that PETS not affected by the projects be counted in any manner. Further, because the Court has found that Amendment 31, which clarified the obligation to collect PETS data, was valid, and Amendment 31 clearly did not require a project-specific survey seeking bats, Plaintiffs' argument necessarily fails. Given that the Forest Service had good reason to believe that no bats were in the project area, and that even if they were they would not be harmed by the proposed vegetation management methods, Amendment 31 clearly relieved the Forest Service from the obligation to undertake a futile search for bats. In sum, Defendants' conclusion that bats were probably not present in the project areas, and that even if they were, there would be no adverse effect on the bats from the proposed actions, was not arbitrary and capricious.

### F. *Count IV—NEPA Claim*

█ Count IV alleges that the Forest Service violated NEPA. Count IV challenges the Forest Service's action in issuing the environmental assessments, claiming that they were contrary to law and otherwise arbitrary and capricious. Plaintiffs' argument is that the environmental assessments did not properly take into account the fact that the projects violated a statute (NFMA) because of inadequate population inventory information on PETS and insufficient quantitative data on MIS. Under the APA, 5 U.S.C. § 706(2)(A), and NEPA, 40 C.F.R. § 1508.27(b)(10), where a proposed project violates a federal statute NEPA approval is inappropriate. Because the Court has already determined that Defendants' actions did not violate NFMA, the environmental assessments were neither arbitrary nor capricious in finding that the Forest Service had collected sufficient PETS and MIS data. Therefore this argument is unavailing.

Plaintiffs have not put forth any argument as to why the project activities would have a significant effect on the human environment. Accordingly, Defendants are entitled to judgment on Count IV.

### CONCLUSION

For the reasons set forth above, the previously entered restraining order is VACATED. Plaintiffs' Motion for Summary Judgment [# 124] is DENIED and Defendants' Motion for Summary Judgment [# 144] is GRANTED. Any claim that Amendment 35 is invalid is dismissed without prejudice. Plaintiffs' claim of invalidity of the 2002 Supplement to the VMEIS is dismissed without prejudice. Plaintiffs' Motion to Supplement the Administrative Record [# 137] to add materials related to Amendment 31 is GRANT-ED. Defendants' Motion for Extension of Time [# 128] is DISMISSED AS MOOT.